

# In the Missouri Court of Appeals
## Western District

NORTH AMERICAN SAVINGS BANK.  )
F.S.B.,                       )
               Appellant,  )     WD78389
v.                            )
                         )
DARCY WILLIAMSON, CHAPTER 7   )     FILED:  March 8, 2016
TRUSTEE,                      )
           Respondent.  )

## APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
### THE HONORABLE LARRY D. HARMAN, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### VICTOR C. HOWARD AND GARY D. WITT, JUDGES

North American Savings Bank, F.S.B. ("NASB") appeals the circuit court's

order denying its petition to quiet title to real property located in Clay County,

Missouri.  NASB contends the circuit court erroneously applied the law in

concluding that McCorkendale Construction, Inc. ("McCorkendale")[1] had superior

interests in the real property.  NASB argues that McCorkendale's judgment lien was

invalid and unenforceable against the property and that NASB's interest in the

---

[1] After the circuit court's judgment, McCorkendale filed a Chapter 7 bankruptcy petition in the
United States Bankruptcy Court, District of Kansas.  Darcy Williamson was appointed as trustee of
the bankruptcy estate.  We granted NASB's motion to substitute Williamson as the real party in
interest in this appeal.

property was therefore superior to McCorkendale's. For reasons explained herein, we reverse the circuit court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

NASB filed suit against McCorkendale to quiet title to certain real estate located within the Hills of Montclair subdivision ("the Montclair land") in Clay County, Missouri. The Montclair land was previously developed by Duggan Homes, Inc. ("Duggan"). In 2004, Duggan financed the development of the Montclair land with loans from NASB. To secure the loan, Duggan gave NASB a Deed of Trust ("2004 Deed of Trust"), which legally described the entirety of the Montclair land. In 2005 and 2006, Duggan hired McCorkendale to install the underground utilities in the Montclair land. Duggan defaulted on its loans from NASB and was unable to pay McCorkendale for work it completed on the underground utilities.

In 2008, NASB requested that the trustee under the 2004 Deed of Trust conduct a non-judicial foreclosure of the Montclair land. The trustee conducted a sale on October 31, 2008, in which NASB was the prevailing bidder. NASB received and recorded a trustee's deed ("2008 Trustee's Deed) to the property. However, the legal description in the 2008 Trustee's Deed mistakenly omitted 12 acres of undeveloped land and certain common ground property ("the disputed property") within the Montclair land.[2] Thus, Duggan remained the record owner of the disputed property.

---

[2] NASB's titling company had adopted a post-platting legal description in the 2008 Trustee's Deed rather than the metes-and-bounds description contained in the 2004 Deed of Trust.

2

In November 2008, Duggan recorded an "Equitable Right to Set Aside Trustee's Deed" in which it claimed that it was not in default. In response, NASB filed a quiet title action in Clay County to resolve the conflicting claims of ownership in the Montclair land. In addition to the quiet title action, NASB instituted three other lawsuits against Duggan relating to mortgage liens covering other subdivisions that Duggan had developed in Kansas and Missouri.

In January 2009, Duggan instituted a declaratory judgment action in Johnson County, Kansas against approximately 67 of its creditor subcontractors, seeking to establish what amounts, if any, it owed to them. McCorkendale was named as a defendant. On May 26, 2009, Duggan and McCorkendale stipulated to a journal entry in that action ("the First Kansas Journal Entry") for the entry of judgment in favor of McCorkendale against Duggan in the amount of $438,197.36, "subject to the conditions set out herein." The entry stated that the judgment shall create a lien only on certain property specifically identified in Exhibit A, which was attached thereto.[3] The entry also stated that execution of the judgment would be stayed until such time as the parties mutually agreed. On April 28, 2010, Duggan and McCorkendale stipulated to an amended journal entry ("the Second Kansas Journal Entry") which contained the same judgment amount of $438,197.36 against Duggan, but removed the two conditions that were contained in the First Kansas Journal Entry.

---

[3] The disputed property was not described in the exhibit.

In May 2010, Judge Moriarty—a Johnson County, Kansas District Court judge—conducted a multi-case mediation between NASB and Duggan. As a result of this mediation, NASB and Duggan entered into a confidential settlement agreement to resolve their quiet title dispute and all other pending litigation between them ("the Global Settlement"). Under the terms of the Global Settlement, the parties agreed that NASB would receive title to all of the Montclair Land "as sold by the trustee's sale on October 31, 2008." Thus, the Global Settlement incorporated the same mistaken legal description that was contained in the 2008 Trustee's Deed—omitting the disputed property from the legal description.

In December 2010, NASB discovered the mistaken legal description in the 2008 Trustee's Deed while attempting to sell the Montclair land. NASB asked Duggan to deliver a quitclaim deed covering the disputed property in order to clear any cloud on its title. Duggan refused and claimed that the Global Settlement did not require a transfer of the disputed property. At that time, the parties tendered the dispute to Judge Moriarty in Kansas for arbitration.

On March 10, 2011, before the dispute over the terms of the Global Settlement was resolved, McCorkendale sought to register its Kansas judgment against Duggan as a foreign judgment in Missouri, thus obtaining a judgment lien over any property in Clay County for which Duggan was the record owner. McCorkendale filed an "Affidavit of Attorney Registration of Foreign Judgment" and attached an authenticated copy of the First Kansas Journal Entry in the Clay

4

County Circuit Court.  Duggan received notice of the registration proceeding but did not file a responsive pleading or otherwise contest it.  The Clay County Circuit Court registered the First Kansas Journal Entry as a final judgment against Duggan in Missouri.

In May 2011, after McCorkendale's foreign judgment was registered in Missouri, NASB and Duggan arbitrated their dispute over the terms of the Global Settlement in Kansas.  Judge Moriarty entered a "Journal Entry Clarifying Settlement Agreement" in which he ruled that the parties had intended that the original agreement in 2010 was to transfer *all* of the Montclair land to NASB, including the disputed property.  Duggan appealed.  The Kansas Court of Appeals affirmed Judge Moriarty's decision, concluding that "Judge Moriarty properly reformed the written agreement because it did not state the true settlement he had mediated."  Accordingly, the court ordered Duggan to convey title to the disputed property to NASB.  Duggan executed quitclaim deeds to the disputed property to NASB in December 2013 and May 2014.

NASB instituted the instant quiet title action against McCorkendale, claiming to be the unencumbered, fee simple owner of all of the Montclair land, including the disputed property.  McCorkendale counterclaimed, alleging that its registration of foreign judgment created a judgment lien against the disputed property pursuant to Section 511.350, RSMo.[4]  McCorkendale claimed that because NASB had not obtained legal title to the disputed property until after McCorkendale had registered

---

[4] All statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2013 Cumulative Supplement.

5

its foreign judgment, any interest NASB claimed to the disputed property was inferior to McCorkendale's judgment lien.

On December 18, 2014, a bench trial was held in the Clay County Circuit Court. At trial, McCorkendale introduced into evidence both the First Kansas Journal Entry (which was filed in the registration proceeding) and the Second Kansas Journal Entry (which was not filed in the registration proceeding). The circuit court was aware that the First Kansas Journal Entry specifically stated that a judgment lien could not attach to the disputed property. However, the court stated that it did not consider there to be "any substantive difference" between the entries. The court reasoned that the monetary amount was the same in both entries, and that the Second Kansas Journal Entry "merely removed the stay of execution restriction and the restriction as to which real properties could have judgment liens imposed on them, thereby enabling [McCorkendale] to proceed with the registration of its Kansas judgment in [Missouri]."

Ruling in McCorkendale's favor, the court stated:

The central question in this case is whether [McCorkendale]'s registration of its Kansas foreign judgment on March 10, 2011 is valid. If so, then [McCorkendale]'s judgment lien on the remaining 12 acres of undeveloped land and the common area property in the Hills of Montclair subdivision is superior to the interests of NASB in that property because NASB did not obtain legal title to the property until it received the Quit Claim Deeds from [Duggan] on May 2, 2013 [sic] and December 6, 2013.

The court concluded that McCorkendale's registration of the Kansas foreign judgment was valid. Thus, the court held that McCorkendale had a judgment lien

6

against the disputed property that was superior to any interest held by NASB. NASB appeals.

## STANDARD OF REVIEW

After a court-tried case, we will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "[W]hen the evidence is uncontroverted and the case is virtually one of admitting the facts or when the evidence is not in conflict, we are not obligated to defer to the trial court's findings." *Little v. Vincent*, 248 S.W.3d 714, 718 (Mo. App. 2008) (citation omitted). Moreover, questions of law are reviewed *de novo*. *Am. Family Mut. Ins. Co. v. Coke*, 358 S.W.3d 576, 579 (Mo. App. 2012).

## ANALYSIS

NASB brings five points on appeal. Because resolution of Point II is dispositive, we need not address the remaining points. In Point II, NASB disputes the validity and effect of McCorkendale's registration of the Kansas foreign judgment. Specifically, NASB argues that the circuit court erred in concluding that the First Kansas Journal Entry created a valid, enforceable lien on the disputed property. Thus, NASB argues that the circuit court erroneously applied the law in entering judgment in favor of McCorkendale and against NASB on its quiet title action. We agree.

7

In a suit to quiet title, "the burden of proof is on the party seeking quiet title to prove better title than that of its adversary." *US Bank, N.A. v. Smith*, 470 S.W.3d 17, 26 (Mo. App. 2015) (citation and internal quotations omitted). The party claiming title "must rely upon the strength of his own title and not upon the weaknesses in the title of his opponent." *McCord v. Gates*, 159 S.W.3d 369, 374 (Mo. App. 2004) (citation omitted). In order to prevail, it was not necessary for NASB to "establish an indefeasible title against the whole world, but only that [its] title is good as against [McCorkendale]." *Id.*

Much of the litigation below involved a dispute as to whether the Kansas judgment that McCorkendale registered was final under Kansas law. NASB argued that because the First Kansas Journal Entry did not include a certification of finality and was subject to modification by the parties, the Clay County Circuit Court lacked the authority to register it as a foreign judgment. *See Estate of Angevine v. Evig*, 675 S.W.2d 440, 443 (Mo. App. 1984) ("Only final judgments of a sister state are entitled to full faith and credit."). McCorkendale argued, and the trial court held, that NASB was out of time to challenge the foreign judgment's registration. *See* § 511.760.7. Thus, McCorkendale asserts that the judgment formed the proper basis for a statutory lien on all real estate owned by Duggan in Clay County under Section 511.350. As explained below, however, we need not decide whether NASB can challenge the validity of the registration of the foreign judgment.

8

Missouri state courts must accord full faith and credit to the valid judgments of other states. *Doctor's Assocs., Inc. v. Duree*, 30 S.W.3d 884, 887 (Mo. App. 2000). "Registration of a foreign judgment occurs under [the] Uniform Enforcement of Foreign Judgments Law when an authenticated copy of [the] foreign judgment is filed in the circuit clerk's office."[5] *Food Servs. Corp. v. Rheam*, 145 S.W.3d 484, 489 (Mo. App. 2004). Upon registration of the foreign judgment, we presume that the sister state's court followed its laws and entered a valid judgment. *Duree*, 30 S.W.3d at 887.

Although McCorkendale's foreign judgment is presumed valid and entitled to full faith and credit, we accept foreign judgments only in the form that they were rendered. *Delhagen v. Miracle Recreation Equip. Co., Inc.*, 891 S.W.2d 192, 193 (Mo. App. 1995). "Missouri courts do not go beyond the language of the judgment in affording full faith and credit to it." *Id.* The judgment that McCorkendale registered in Clay County expressly stated that "the judgment in favor of [McCorkendale] *shall only be a judgment lien on the property identified on Exhibit A to this Journal Entry*. . ." (Emphasis added). Moreover, the judgment further provided that McCorkendale would provide Duggan "a release of judgment lien for *any and all other rights* which may be asserted by [McCorkendale] to the extent the judgment attaches to *any other property . . . that is not identified on Exhibit A to this Journal Entry*." (Emphasis added). The parties agree, and the circuit court

---

[5] Under Rule 74.14, "[a] copy of any foreign judgment authenticated in accordance with the act of Congress or the statutes of this state may be filed in the office of the clerk of any circuit court of this state." Rule 74.14(b).

was aware, that the disputed property was not identified on Exhibit A. Thus, McCorkendale's registration of the First Kansas Journal Entry could not effectuate a valid, enforceable judgment lien against that property.

McCorkendale argues, however, that there is no substantive difference between the First Kansas Journal Entry and the Second Kansas Journal Entry because the monetary amount of the judgment against Duggan remained the same. McCorkendale claims that the Second Kansas Journal Entry "merely removed the stay of execution restriction and the restriction as to which real properties could have judgment liens imposed on them." McCorkendale characterizes the Second Kansas Journal Entry as effecting only "two minor changes." We disagree with McCorkendale's contention that there is no substantive difference between the two entries. Although the monetary amount of the judgment is identical, one entry prohibits McCorkendale from asserting a lien on the disputed property, the other does not. McCorkendale's introduction of the Second Kansas Journal Entry into evidence cannot cure the defect in the original registration. Because McCorkendale did not register the Second Kansas Journal Entry—which would have allowed McCorkendale to assert a lien on the disputed property—that entry never became a judgment in Missouri.[6]

---

[6] *See Delhagen v. Miracle Recreation Equip. Co., Inc.*, 891 S.W.2d 192, 193–94 (Mo. App. 1995) (concluding that Missouri courts could not go beyond the plain terms of the foreign judgment to enforce the judgment against a defendant not named in the entry); *Overman v. Overman*, 514 S.W.2d 625, 633 (Mo. App. 1974) (finding that "Supplemental Decree" that was not properly authenticated would be inadmissible in registration proceeding to cure defect in registered judgment that was not final).

The Kansas judgment that McCorkendale chose to register in Clay County specifically prohibited McCorkendale from asserting a lien on the disputed property. For that reason, we conclude that McCorkendale has obtained no rights in the disputed property by way of its registered foreign judgment. Because NASB received and recorded quitclaim deeds to that property, it has necessarily shown that it has superior interests in the property over one who has no interest in the property. This evidence, alone, requires that NASB's petition to quiet title be granted. Point II is granted.[7]

## CONCLUSION

For all of the foregoing reasons, we reverse the circuit court's rulings against NASB on its petition to quiet title and in favor of McCorkendale on its counterclaim to quiet title to the disputed property. Pursuant to Rule 84.14, we enter judgment quieting title to the Montclair land in favor of NASB.[8]

---

[7] Because our resolution of Point II is dispositive, we need not address the remaining points.

[8] With the exception of Lot 95—which Duggan was to retain under the Global Settlement—we quiet title to all of the Montclair land in NASB's favor. This property is legally described in the 2004 Deed of Trust as:

Tract I:

Lots 1, 2, 3, 6, 7, 9, 14 through 17, 19 through 22, 24 through 28, 36, 37, 39 through 41, 43 through 55, 57 through 61 and Tracts A, B, and C, HILLS OF MONTCLAIR – FIRST PLAT, a subdivision in Kansas City, Clay County, Missouri.

Tract II:

A tract of land over part of the Southeast Quarter and part of the Southwest Quarter, both being in Section 35, Township 52, Range 32, in the City of Kansas City, Clay County, Missouri, more particularly described as follows:

Beginning at the most Easterly corner of Tract C, HILLS OF MONTCLAIR – FIRST PLAT, a subdivision in said city, county and state, said corner also being on the

11

Northwesterly right-of-way line of NE Flintlock Road, as established by MONTCLAIR – FIRST PLAT, a subdivision in said city, county and state; thence North 26 degrees 15 minutes 53 seconds West, along the Northeasterly line of said HILLS OF MONTCLAIR – FIRST PLAT, a distance of 195.19 feet; thence North 19 degrees 21 minutes 14 seconds West, continuing along said Northeasterly line, a distance of 74.28 feet; thence North 29 degrees 34 minutes 27 seconds West, continuing along said Northeasterly line, a distance of 57.31 feet; thence North 32 degrees 09 minutes 55 seconds West, continuing along said Northeasterly line, a distance of 102.61 feet, to a point on the Southeasterly right-of-way line of NE 97th Street, as established by said HILLS OF MONTCLAIR – FIRST PLAT; thence Northeasterly, along the Southeasterly right-of-way line of said NE 97th Street, and along a curve to the right, having a radius of 1575.00 feet, a central angle of 03 degrees 57 minutes 07 seconds, and whose initial tangent bearing is North 52 degrees 30 minutes 46 seconds East, a distance of 108.63 feet, to a point on the Northeasterly line of said HILLS OF MONTCLAIR – FIRST PLAT; thence North 33 degrees 32 minutes 07 seconds West, along said Northeasterly line, a distance of 182.14 feet; thence North 47 degrees 27 minutes 02 seconds East, continuing along said Northeasterly line, a distance of 13.08 feet; thence North 50 degrees 49 minutes 57 seconds West, continuing along said Northeasterly line, a distance of 309.51 feet; thence North 39 degrees 49 minutes 05 seconds East, continuing along said Northeasterly line, a distance of 25.58 feet; thence North 62 degrees 20 minutes 10 seconds West, continuing along said Northeasterly line, a distance of 99.42 feet; thence North 58 degrees 01 minutes 02 seconds West, continuing along said Northeasterly line, a distance of 70.93 feet; thence North 35 degrees 32 minutes 12 seconds West, continuing along said Northeasterly line, a distance of 65.25 feet; thence North 15 degrees 17 minutes 42 seconds West, departing said Northeasterly line, a distance of 58.75 feet; thence North 04 degrees 37 minutes 38 seconds East, a distance of 58.80 feet; thence North 24 degrees 15 minutes 14 seconds East, a distance of 58.80 feet; thence North 43 degrees 52 minutes 50 seconds East, a distance of 58.80 feet; thence North 63 degrees 30 minutes 27 seconds East, a distance of 58.80 feet; thence North 78 degrees 15 minutes 57 seconds East, a distance of 84.76 feet; thence South 85 degrees 57 minutes 56 seconds East, a distance of 94.15 feet; thence North 48 degrees 48 minutes 56 seconds East, a distance of 159.57 feet; thence North 37 degrees 07 minutes 47 seconds West, a distance of 177.22 feet, to a point on a curve; thence Southwesterly, along a curve to the right, having a radius of 387.00 feet, a central angle of 04 degrees 46 minutes 51 seconds, and whose initial tangent bearing is South 52 degrees 52 minutes 13 seconds West, a distance of 32.29 feet; thence North 32 degrees 20 minutes 56 seconds West, a distance of 130.30 feet; thence North 59 degrees 51 minutes 45 seconds East, a distance of 73.20 feet; thence North 49 degrees 55 minutes 49 seconds East, a distance of 78.81 feet; thence North 21 degrees 33 minutes 27 seconds East, a distance of 78.72 feet; thence South 80 degrees 19 minutes 07 seconds East, a distance of 25.12 feet; thence North 69 degrees 36 minutes 05 seconds East, a distance of 168.41 feet; thence North 20 degrees 23 minutes 55 seconds West, a distance of 1.66 feet; thence North 66 degrees 32 minutes 35 seconds East, a distance of 94.68 feet; thence North 69 degrees 56 minutes 38 seconds East, a distance of 85.57 feet; thence North 82 degrees 17 minutes 35 seconds East, a distance of 65.49 feet; thence South 83 degrees 52 minutes 59 seconds East, a distance of 26.17 feet; thence South 08 degrees 47 minutes 56 seconds East, a distance of 170.00 feet, to a point on a curve; thence Easterly, along a curve to the right, having a radius of 675.00 feet, a central angle

$$\underline{\hspace{6cm}}$$

LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

---

of 03 degrees 06 minutes 05 seconds, and whose initial tangent bearing is North 81 degrees 12 minutes 04 seconds East, a distance of 36.54 feet; thence South 05 degrees 41 minutes 51 seconds East, a distance of 186.46 feet; thence North 64 degrees 19 minutes 13 seconds East, a distance of 282.55 feet, to a point on the Southwesterly right-of-way line of Missouri Route 291, as now established; thence Southeasterly, along the Southwesterly right-of-way line of said Missouri Route 291, and along a curve to the left, having a radius of 1185.92 feet, a central angle of 17 degrees 49 minutes 37 seconds, and whose initial tangent bearing of South 24 degrees 23 minutes 29 seconds East, a distance of 368.98 feet; thence South 47 degrees 46 minutes 54 seconds West, along a jog in said Southwesterly right-of-way line, a distance of 5.00 feet; thence Southeasterly, continuing along said Southwesterly right-of-way line, and along a curve to the left, having a radius of 1190.92 feet, a central angle of 05 degrees 00 minutes 00 seconds, and whose initial tangent bearing is South 42 degrees 13 minutes 06 seconds East, a distance of 109.93 feet; thence North 42 degrees 46 minutes 54 seconds East, along a jog in said Southwesterly right-of-way-line, a distance of 5.00 feet; thence Southeasterly, continuing along said Southwesterly right-of-way line, and along a curve to the left, having a radius of 1185.92 feet, a central angle of 07 degrees 07 minutes 01 seconds, and whose initial tangent bearing is South 47 degrees 13 minutes 06 seconds East, a distance of 147.31 feet, to the most Northerly corner of H.A. Tract I of said MONTCLAIR – FIRST PLAT; thence South 35 degrees 39 minutes 53 seconds West, along the Westerly line of said H.A. Tract I, a distance of 70.00 feet, to the most Westerly corner of said H.A. Tract I; thence South 59 degrees 32 minutes 05 seconds East, along the Southerly line of said H.A. Tract I, a distance of 50.00 feet, to a point on the Northwesterly right-of-way line of said NE Flintlock Road; thence South 30 degrees 27 minutes 55 seconds West, along said Northwesterly right-of-way line, a distance of 488.78 feet, to a point of curvature; thence Southwesterly, continuing along said Northwesterly right-of-way line, and along a curve to the right, having a radius of 1650.00 feet, and a central angle of 32 degrees 14 minutes 26 seconds, a distance of 928.46 feet, to the Point of Beginning.

13